UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

LAMONT HEARD,

    Plaintiff,

v.                                            Case No. 2:05-cv-231
                                              HON. GORDON J. QUIST

PATRICIA CARUSO, et al.,

    Defendants.

_____/

**REPORT AND RECOMMENDATION**

        Plaintiff Lamont Heard, an inmate currently confined at the Marquette Branch Prison, filed this *pro se* civil rights action pursuant to 42 U.S.C. § 1983 against several employees of the Michigan Department of Corrections (MDOC). Specifically, defendants include Patricia Caruso, Straub, Dave Burnett, Robert Mulvaney, Jeri-Ann Sherry, Gregory McQuiggin, M. Brown, Steven Therrian, Sandy Shaw, Daniel Ezrow, Masker and Huhta. Plaintiff has asserted violations of the First, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

        In claim one, plaintiff alleges that on September 18, 2004, he was interviewed by defendant Therrian for statements plaintiff made during a Nation of Islam religious service. Plaintiff states that he received an Incite to Riot or Strike; Strike or Rioting misconduct after the interview. Plaintiff was told that he could no longer recite the history of black enslavement in this country and certain Bible verses during religious services because they "are not fitting in a prison setting." Allegedly, defendant Therrian indicated that he had spoken with defendants Caruso, Sherry, McQuiggin and Shaw, and that Therrian was speaking for them. Plaintiff was informed that if he

continued to speak on these matters, he would be transferred to a level five facility and classified as a Security Threat Group (STG) member. Plaintiff was placed in administrative segregation on an unrelated Incite to Riot/Strike misconduct. On October 5, 2004, plaintiff alleges that he was told by defendant Therrian that all the defendants wanted plaintiff to know that plaintiff needed to sign off on his grievance or that he would be sorry. Plaintiff refused to sign off on the grievance. Later that day, defendant Brown, Chippewa Correctional Facility STG local coordinator, took adverse action against plaintiff by proposing that plaintiff be designated as a member and recruiter of a gang called Intolerant/Subversive groups (claim two). Plaintiff filed a grievance stating that defendant Brown's action was in retaliation for plaintiff's previous grievance filing.

Plaintiff alleges that his procedural due process rights were violated because he never received notice by defendant Brown or the opportunity to be heard before defendant Mulvaney approved the designation (claim three). Plaintiff alleges that he filed a grievance against defendants Brown and Mulvaney for their actions in designating him a security threat.

In claim four, plaintiff alleges that he sent a kite to defendant Caruso asking that the matter be investigated and requesting removal of the STG II designation. On October 20, 2004, Warden Sherry responded by instructing defendant Brown to investigate plaintiff's complaint and plaintiff's request for STG II removal. On October 21, 2004, defendant Brown denied plaintiff's request and stated that plaintiff was not targeted due to his Nation of Islam membership, but did acknowledge that no gang documents were taken from plaintiff. Defendant Brown asserted that plaintiff made a call for "arms." Plaintiff was transferred to Baraga Maximum Correctional Facility from Chippewa Correctional Facility on October 21, 2004. After remaining misconduct free for six months, plaintiff filed a grievance on defendants Ezrow and Mulvaney because they refused to

interview plaintiff for STG II removal. Thereafter, plaintiff was released from administrative segregation.

In claim five, plaintiff alleges that defendants Brown and Ezrow told plaintiff that Intolerant/Subversive groups is a "special designation" that the MDOC Director uses to target members of the Nation of Islam who could not otherwise be labeled as gang members. Plaintiff alleges that other Nation of Islam members have been targeted in the same manner.

In claim six, plaintiff asserts that he has made repeated requests to defendants Burnett, Shaw, Sherry and Straub for meals in accordance with the dietary laws of plaintiff's religious beliefs. Defendants have responded by stating that plaintiff's proposed diet did not meet the nutritional standards set forth by the MDOC. Plaintiff's grievances on this issue were denied. In claim seven, plaintiff alleges that these defendants created a religious policy that favors Jewish and Buddhist prisoners. Plaintiff requests that defendants treat him in an equal manner.

In claim eight, plaintiff alleges that AMF mail room supervisor GOA Masker opened and read plaintiff's legal mail outside plaintiff's presence, despite plaintiff's request to have his legal mail opened only when he is present.

In claim nine, plaintiff alleges that defendant Huhta planted a .40 caliber bullet shell in plaintiff's footlocker during a search of plaintiff's cell. Plaintiff found the bullet shell, removed it with a finger nail clipper and placed it in a plastic bag. Plaintiff gave the shell to Resident Unit Officer Healy. Plaintiff then gave a statement to AMF sergeant McCledon. Defendant Huhta first denied searching plaintiff's cell. Plaintiff alleges that defendant Huhta planted the shell in retaliation for plaintiff's lawsuit. Plaintiff was preparing the complaint at the time the shell was planted. Plaintiff alleges that he asked defendant Huhta to use the prison telephone. Defendant Huhta denied

the request and allegedly stated, "You are going to need more than the telephone if you file your lawsuit. That shell you found was your warning." Plaintiff alleges that defendant Huhta read plaintiff's complaint before it was filed when he searched plaintiff's cell.

Defendants have moved for summary judgment. Summary judgment is appropriate only if the moving party establishes that there is no genuine issue of material fact for trial and that he is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986). If the movant carries the burden of showing there is an absence of evidence to support a claim or defense, then the party opposing the motion must demonstrate by affidavits, depositions, answers to interrogatories, and admissions on file, that there is a genuine issue of material fact for trial. *Id.* at 324-25. The nonmoving party cannot rest on its pleadings but must present "specific facts showing that there is a genuine issue for trial." *Id.* at 324 (quoting Fed. R. Civ. P. 56(e)). The evidence must be viewed in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). Thus, any direct evidence offered by the plaintiff in response to a summary judgment motion must be accepted as true. *Muhammad v. Close*, 379 F.3d 413, 416 (6th Cir. 2004) (*citing Adams v. Metiva*, 31 F.3d 375, 382 (6th Cir. 1994)). However, a mere scintilla of evidence in support of the nonmovant's position will be insufficient. *Anderson*, 477 U.S. at 251-52. Ultimately, the court must determine whether there is sufficient "evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252. *See also Leahy v. Trans Jones, Inc.*, 996 F.2d 136, 139 (6th Cir. 1993) (single affidavit, in presence of other evidence to the contrary, failed to present genuine issue of fact); *cf. Moore, Owen, Thomas & Co. v. Coffey*, 992 F.2d 1439, 1448 (6th Cir. 1993) (single affidavit concerning state of mind created factual issue).

Defendants Caruso, Sherry, McQuiggin and Straub move for dismissal based upon lack of personal involvement. Liability under Section 1983 must be based on more than merely the right to control employees. *Polk Co. v. Dodson*, 454 U.S. 312, 325-26 (1981); *Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978). Thus, Section 1983 liability cannot be premised upon mere allegations of *respondeat superior*. *Monell*, 436 U.S. at 691; *Polk*, 454 U.S. at 325. A party cannot be held liable under Section 1983 absent a showing that the party personally participated in, or otherwise authorized, approved or knowingly acquiesced in, the allegedly unconstitutional conduct. *See e.g. Leach v. Shelby Co. Sheriff*, 891 F.2d 1241, 1246 (6th Cir. 1989), *cert. denied*, 495 U.S. 932 (1990); *Hays v. Jefferson*, 668 F.2d 869, 874 (6th Cir.), *cert. denied*, 459 U.S. 833 (1982). *See also Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir.), *cert. denied* 469 U.S. 845 (1984).

Supervisory officials can be held liable for the acts of their subordinates only if plaintiff establishes that the supervisor failed to appropriately discharge his supervisory duties, and that this failure resulted in a denial or deprivation of plaintiff's federal rights. *See e.g. Leach*, 891 F.2d at 1246; *Hayes v. Vessey*, 777 F.2d 1149, 1154 (6th Cir. 1985). However, the failure of a supervisor to supervise, control or train the offending employee is not actionable absent a showing that the official implicitly encouraged, authorized, approved or knowingly acquiesced in, or in some other way directly participated in, the offensive conduct. *Leach*, 891 F.2d at 1246. Such a claim requires, at a minimum, that the official had knowledge of the offending employee's conduct at a time when the conduct could be prevented, or that such conduct was otherwise foreseeable or predictable. *See e.g. Gibson v. Foltz*, 963 F.2d 851, 854 (6th Cir. 1992). In addition, plaintiff must show that defendant had some duty or authority to act. *See e.g. Birrell v. Brown*, 867 F.2d 956, 959

(6th Cir. 1989) (lower level official not liable for shortcomings of building); *Ghandi v. Police Dept. of City of Detroit*, 747 F.2d 338, 351 (6th Cir. 1984) (mere presence at the scene is insufficient grounds to impose Section 1983 liability in the absence of a duty to act); *accord Hall v. Shipley*, 932 F.2d 1147 (6th Cir. 1991). In addition, merely bringing a problem to the attention of a supervisory official is not sufficient to impose such liability. *See Shelly v. Johnson*, 684 F. Supp. 941, 946 (W.D. Mich. 1987) (Hillman, C.J.), *aff'd* 849 F.2d 228 (6th Cir. 1988). Finally, supervisory liability claims cannot be based on simple negligence. *Leach*, 891 F.2d at 1246; *Weaver v. Toombs*, 756 F. Supp. 335, 337 (W.D. Mich. 1989), *aff'd* 915 F.2d 1574 (6th Cir. 1990).

It appears that plaintiff has sued MDOC Director Caruso, Deputy Director Straub, Warden Sherry and Deputy Warden McQuiggin solely because they retain supervisory capacity over prison personnel that allegedly violated plaintiff's rights. Plaintiff has failed to show that either of these defendants were actually involved in the alleged denial of his rights. In the opinion of the undersigned, defendants Caruso, Straub, Sherry and McQuiggin should be dismissed for lack of personal involvement.

Plaintiff argues that he was improperly designated an STG prisoner in violation of his due process rights. On September 18, 2004, defendant Therrian authored a memorandum which stated in part:

> Prisoner Heard was brought into the Captain's Office and when asked if he knew why he was here he responded "Probably because of the service today." I informed him that I had extreme problems with the statements he had made at the service and he proceeded to attempt to explain the quotes attributed to him, by the chaplain. Prisoner Heard stated he was discussing the oppression of the black man by the white race and that he did make statements that a resurrected man will not put up with mistreatment and will strike back and that he did mention the FOI. (Fruits of Islam-Security force of NOI) He further stated that

> he made statements that the only way to establish peace was through war. He explained this by stating the United States of America went to war in Iraq in order to bring peace to the country. He also stated that the officers do not want peace as that disharmony is the "crux of their existence" and maintains their jobs and livelihood. I asked what he meant by "we have a real problem here" and Heard responded he meant at URF as the officers here do not respect the black man, but they will. I also asked as to what he was advocating by stating "This government has broken the black man, it is our duty to resurrect the brothers, bring them to this study group and teach them that Allah has a plan for them." He stated that it was the function of the NOI to involve as many black men as possible to their cause. I again inquired as to the reference to the Passion of the Christ, and Heard stated that Jesus was persecuted as is the black man today by the white man. Heard made numerous statements concerning the persecution of the black man and the involvement of the white man in beating and persecuting the black man since they came from Africa. I informed him that his statements and behavior were inflammatory in a prison setting and that he would be removed from general population. Prisoner Heard stated that Jesus was persecuted and crucified and there were ramifications, and so shall I be persecuted and so shall there be ramifications. Prisoner Heard stood by his statements and quotes as reported by Chaplain Shaw and only stated that he felt they were taken out of context and that all men should be able to interpret "what they will" when he provides messages about black history. I stated to Prisoner Heard that he was well aware of the ramifications of his speaking in this manner by the quote made concerning "If they react to this message-some of us be put in prison-we already in prison," and he stated what more can be done when you are already in prison and Jesus made this quote in the Bible. Prisoner Heard was placed in Steamboat and a misconduct for 022 Incite to Riot or Strike: Rioting or striking was written.

Docket #78, exhibit E. After a hearing plaintiff was found guilty of the misconduct. Lieutenant Therrian forwarded his report of the incident to ADW Perry who forwarded all the information to Sergeant Brown for review as the facility STG Coordinator. Due to his conduct plaintiff was designated as an Intolerant/Subversive STG II. The designation was based upon plaintiff's individual actions and not on his involvement in a particular group.

In *Sandin v. Conner*, 515 U.S. 472, 115 S. Ct. 2293 (1995), the plaintiff alleged that prison officials deprived him of procedural due process by refusing to allow him to present witnesses during a disciplinary hearing and then sentencing him to segregation for misconduct. *Sandin*, 515 U.S. at 474, 115 S. Ct. at 2294. In reversing the Ninth Circuit's decision that the prisoner had a liberty interest in remaining free of disciplinary segregation, the Supreme Court abandoned the search for mandatory language in prisoner regulations as previously called for under *Hewitt v. Helms*, 459 U.S. 460 (1983), and ruled instead that it was time to return to the due process principles which were established in *Wolff v. McDonnell*, 418 U.S. 539 (1974), and *Meachum v. Fano*, 427 U.S. 215 (1976). *Sandin*, 515 U.S. at 483, 115 S. Ct. at 2300 (internal citations omitted).

In *Sandin*, the Supreme Court noted that in some cases, a restraint might be so extreme as to implicate rights arising directly from the Due Process Clause itself. *Sandin*, 515 U.S. at 483-484, 115 S. Ct. at 2300 (internal citations omitted). In addition, the Court recognized that States may create liberty interests protected by the Due Process Clause where the freedom from restraint imposed "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 484, 115 S. Ct. at 2300. However, such restraints are rare and do not include, for example, transfer into solitary confinement. *Sandin*, 515 U.S. at 486, 115 S. Ct. at 2301. Nor does placement in administrative segregation normally constitute such a hardship. *Jones v. Baker*, 155 F.3d 810, 812 (6th Cir. 1998); *Mackey v. Dyke*, 111 F.3d 460, 463 (6th Cir.), *cert. denied*, 522 U.S. 848 (1997); *Rimmer-Bey v. Brown*, 62 F.3d 789 (6th Cir. 1995). In addition, Plaintiff has no right to prison employment or to early release on parole. *Greenholtz v. Inmates, Nebraska Penal and Correctional Complex*, 442 U.S. 1, 7 (1979); *Board of Pardons v. Allen*, 482 U.S. 369 (1987); *Sweeton v. Brown*, 27 F.3d 1162, 1164-65 (6th Cir. 1994), *cert. denied*,

513 U.S. 1158 (1995); *Newsom v. Norris*, 888 F.2d 371, 374 (6th Cir.1989). Moreover, there is no right under federal law allowing a prisoner to prevent a transfer to another facility or giving him any choice concerning the facility where he will be incarcerated. *Meachum*, 427 U.S. at 223-29[1]; *Olim v. Wakinekona*, 461 U.S. 238 (1983).

A plaintiff seeking to allege a procedural due process violation based on a state created liberty interest must not only show it is derived from mandatory language in a regulation, but also that it imposes an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 484, 115 S. Ct. at 2300; *Rimmer-Bey*, 62 F.3d at 790-791. Pursuant to *Sandin*, "a liberty interest determination is to be made based on whether it will affect the overall duration of the inmate's sentence, and there is no evidence here that the segregation will impact Plaintiff's sentence." *Jones*, 155 F.3d at 812. The Sixth Circuit has determined that a prisoner's placement in administrative segregation for over a year is not an atypical or significant hardship as to create a liberty interest in due process. *Mackey v. Dyke*, 111 F.3d 460, 461-63 (6th Cir.), *cert. denied*, 522 U.S. 848 (1997). Because plaintiff cannot establish that his increased classification due to his STG related conduct constitutes an "atypical and significant hardship," it is the opinion of the undersigned that plaintiff's claim that he was denied procedural due process is without merit. Similarly, any assertion that defendants violated plaintiff's equal protection rights or were involved in placing him on STG status for retaliatory purposes is unfounded. Defendants have established that plaintiff was designated an STG prisoner solely based upon plaintiff's conduct.

---

[1] In *Meachum v. Fano*, 427 U.S. 215, 223-229 (1975), the Court held that transfers between prisons of different severity, such as between a medium security prison and a maximum security prison, did not deprive the prisoner of liberty within the meaning of the Due Process Clause.

Plaintiff alleges that defendant Huhta planted a spent shell casing in plaintiff's cell in retaliation for the filing of a lawsuit. Retaliation based upon a prisoner's exercise of his or her constitutional rights violates the Constitution. *See Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir.1999) (en banc). In order to set forth a First Amendment retaliation claim, a plaintiff must establish that: (1) he was engaged in protected conduct; (2) an adverse action was taken against him that would deter a person of ordinary firmness from engaging in that conduct; and (3) the adverse action was motivated, in least in part, by the protected conduct. *Thaddeus-X*, 175 F.3d at 394. Moreover, Plaintiff must be able to prove that the exercise of the protected right was a substantial or motivating factor in the defendant's alleged retaliatory conduct. *See Smith v. Campbell*, 250 F.3d 1032, 1037 (6th Cir. 2001) (citing *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)). Plaintiff's retaliation claim is speculative at best. Plaintiff has not established that he engaged in protective conduct. Apparently, plaintiff was planning on filing a lawsuit. However, whether defendant Huhta was aware of plaintiff's plans to file a lawsuit is completely speculative. Plaintiff never told defendant Huhta about his plan to file a lawsuit. Plaintiff suffered no adverse conduct as a result of the shell casing which he found in his cell. Moreover, there exists no evidence to establish that defendant Huhta intentionally placed the shell casing in plaintiff's cell, or was responsible for the shell that was found in plaintiff's cell. Defendant Huhta was on the shooting range and believes that is it possible that the shell casing could have fallen out of his pocket while conducting a search of plaintiff's cell. Plaintiff's assertion that the shell was intentionally placed in his cell for retaliatory purposes is mere speculation.

Plaintiff alleges that he was denied a religiously mandated meal. Plaintiff requested and was denied a "Nation of Islam diet." Plaintiff alleges that defendants violated his equal

protection rights in denying him his requested religious based diet. To establish a violation of the Equal Protection Clause, an inmate must show that the defendants purposefully discriminated against him. *Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977). Such discriminatory purpose must be a motivating factor in the actions of the defendants. *Id*. at 265-66. Plaintiff's request for a diet in conformance with the Nation of Islam beliefs was denied because it was not believed that it was possible to meet the required nutritional standards required by department policy under the proposed diet. Plaintiff's request was denied by the Food Service Director for the following reasons:

> Your kite has been assigned to me to address your question pertaining to authorized Religious diets. Per PD 05.03.150 Religious Beliefs and Practices of Prisoners, pg 7 0f 10, paragraph PP. The regular diet menu shall be posted a minimum of one week in advance in all facilities at which meals are provided to prisoners to permit observance of any religious dietary restrictions. Prisoners shall be permitted to abstain from any foods that violate their religious tenets. Non-meat entrees shall be available as set forth in PD 04.07.100 "Offender Meals."
>
> Paragraph RR. The CFA or FOA Deputy Director or designee may authorize the development of a separate menu to meet the necessary religious dietary restrictions of a prisoner. Such menus shall meet the minimum nutritional standards set forth in PD 04.07.100 "Offender Meals." The appropriate Deputy Director or designee shall have final approval of such menus and shall determine at which facilities the meals will be offered. Kosher meals shall be provided in CFA institutions as set forth in OP 05.03.150-A "Kosher Meal Program."
>
> Paragraph TT. A prisoner may eat from a religious menu only with approval of the CFA Special Activities Coordinator. Approval shall be granted only if it is necessary to the practice of the prisoners designated prisoners religion.
>
> The Department has chosen not to provide the menu plan as explained in "How to Eat to Live" based on our belief that it would

>not be possible to meet the required nutritional standards required by PD 04.07.100 "Offender Meals."
>
>There is no such approved religious meal for the Nation of Islam per policy.

Docket #78, exhibit F-A. According to defendant Burnett, the MDOC rejected a religious menu for Nation of Islam members several years ago, because it was determined that the menu could not be provided to meet nutritional requirements. Defendant Burnett stated that Muslim's can select the non-meat choice when pork is served as the main meal. Accordingly, plaintiff's equal protection rights were not violated when he was denied a diet that fails to compart with nutritional requirements. Moreover, plaintiff has the opportunity to choose non-pork food items to accommodate his religious beliefs.

Plaintiff alleges that his legal mail was opened outside his presence. Plaintiff alleges that defendant Masker on one occasion opened his legal mail outside plaintiff's presence. Defendant Masker submitted an affidavit that states that plaintiff was coded to receive special handling of his incoming legal mail. Mail must be appropriately identified as legal mail before special handling can be accommodated. Defendant Masker is not aware of what happened in this specific situation because plaintiff has not attached the envelope. In the event one letter was opened outside plaintiff's presence, defendant Masker states that it may have been an inadvertent mistake.

Incoming mail has long been recognized to pose a greater threat to prison order and security than outgoing mail. *Thornburgh v. Abbott*, 490 U.S. 401 (1989); *Turner v. Safley*, 482 U.S. 78 (1987). The Michigan Department of Corrections may require that inmates specifically request that their legal mail be opened in their presence. *Knop v. Johnson*, 667 F. Supp. 467, 473 (W.D. Mich. 1987), *appeal dismissed*, 841 F.2d 1126 (6th Cir. 1988). Further, a prison can restrict the

opening of special mail in the presence of the inmate to those situations wherein the sender is identified as an attorney and the envelope makes a specific restriction on the opening. *Wolff v. McDonnell*, 418 U.S. 539, 576-77 (1974). With regard to mail from an inmate's attorney, prison officials have a right to open and inspect such mail for contraband. However, they may not read the mail and must allow the prisoner to be present, upon request, if the envelope is marked as confidential. *Lavado v. Keohane*, 992 F.2d 601, 607-09 (6th Cir. 1993); *see also Brewer v. Wilkinson*, 3 F.3d 816, 825 (5th Cir. 1993) (court abandoned the *per se* rule that the Constitution requires that the opening and inspection of legal mail be in the presence of the inmate). Even so, not all mail a prisoner receives from a legal source will implicate constitutionally protected legal mail rights. *Sallier v. Brooks*, 343 F.3d 868, 873 (6th Cir. 2003). Some legal mail may have nothing to do with a prisoner's access to the courts, redress of grievances or relationship with an attorney. *Id*. Plaintiff has failed to establish that his legal mail was improperly handled. Plaintiff's assertion is conclusory and not supported by any evidence.

Similarly, plaintiff asserts a violation of his First Amendment rights to express his religious beliefs, a Sixth Amendment claim of interference with his right to counsel, and an Eighth Amendment claim. These claims appear baseless in law and fact. Plaintiff has not presented the court with any factual basis to conclude that his constitutional rights were violated by any of the named defendants.

Accordingly, in the opinion of the undersigned, defendants are entitled to qualified immunity. Government officials, performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Dietrich v. Burrows*, 167 F.3d

1007, 1012 (6th Cir. 1999); *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997); *Noble v. Schmitt*, 87 F.3d 157, 160 (6th Cir. 1996); *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). An "objective reasonableness" test is used to determine whether the official could reasonably have believed his conduct was lawful. *Dietrich*, 167 F.3d at 1012; *Anderson v. Creighton*, 483 U.S. 635, 641 (1987).

The procedure for evaluating claims of qualified immunity is tripartite: First, we determine whether a constitutional violation occurred; second, we determine whether the right that was violated was a clearly established right of which a reasonable person would have known; finally, we determine whether the plaintiff has alleged sufficient facts, and supported the allegations by sufficient evidence, to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights. *Williams v. Mehra*, 186 F.3d 685, 690 (6th Cir. 1999).

When determining whether a right is clearly established, this court must look first to decisions of the United States Supreme Court, then to decisions of the Sixth Circuit and to other courts within this Circuit, and finally to decisions of other circuits. *Dietrich*, 167 F.3d at 1012. An official action is not necessarily protected by qualified immunity merely because the very action in question has not previously been held to be unlawful. Rather, in light of pre-existing law, the unlawfulness of the official's conduct must be apparent. *Dietrich*, 167 F.3d at 1012; *Wegener v. City of Covington*, 933 F.2d 390, 392 (6th Cir. 1991).

When making a qualified immunity analysis, the facts must be interpreted in the light most favorable to the plaintiff. Part of the analysis is to determine whether there are any genuinely disputed questions of material fact. *Kain v. Nesbitt*, 156 F.3d 669, 672 (6th Cir. 1998). Where there is a genuinely disputed question of fact, it is for the trier of fact to resolve, not the judge. "This

would be true notwithstanding that the trial judge found the [defendant] officer to be more credible than the plaintiff because it is not for the court to make credibility determinations at this stage of the proceeding." *Id.*

The operation of the qualified immunity standard depends substantially upon the level of generality at which the relevant legal rule is to be identified.

> The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in light of the preexisting law the unlawfulness must be apparent.

*Anderson*, 483 U.S. at 639-40.  *See also Durham v. Nu'Man*, 97 F.3d 862, 866 (6th Cir. 1996), *cert. denied*, 520 U.S. 1157 (1997).

The Sixth Circuit has observed:

> A right is not considered clearly established unless it has been authoritatively decided by the United States Supreme Court, the Court of Appeals, or the highest court of the state in which the alleged constitutional violation occurred.

*Durham*, 97 F.3d at 866 (citing *Robinson v. Bibb*, 840 F.2d 349, 351 (6th Cir. 1988)).

Thus, qualified immunity is not triggered only where the very action in question was previously held unlawful. *Anderson*, 483 U.S. at 639-40.  Rather, the test is whether the contours of the right were sufficiently clear that a reasonable official would understand that what he is doing violated plaintiff's federal rights.  *Id.*

Furthermore, a defendant need not actively participate in unlawful conduct in order to be liable under Section 1983.  Rather, a defendant may be liable where he has a duty to protect a plaintiff and fails to comply with this duty.  *Durham*, 97 F.3d at 866-868 (holding that a nurse and

a security guard at a state hospital may be liable under Section 1983 where they do not take action to prevent a patient from being beaten). *See also McHenry v. Chadwick*, 896 F.2d 184 (6th Cir. 1990)(a correctional officer who observes an unlawful beating may be liable under Section 1983 even though he did not actively participate in the beating), and *Bruner v. Dunaway*, 684 F.2d 422 (6th Cir. 1982), *cert. denied sub nom*, *Bates v. Bruner*, 459 U.S. 1171 (1983)(police officers who stood by and observed an unlawful beating by fellow officers could be held liable under Section 1983).

When faced with a qualified immunity defense, the court must first determine whether or not the plaintiff has stated a claim upon which relief can be granted. *Siegert v. Gilley*, 500 U.S. 226, 232 (1991); *Turner*, 119 F.3d at 429. If the court answers that question in the affirmative, the court goes on to determine whether or not the right allegedly violated was clearly established. *Turner*, 119 F.3d at 429. These are both purely legal questions. The immunity issue should not be resolved if there are factual disputes on which the issue of immunity turns such that it cannot be determined before trial whether the defendants' conduct violated clearly established rights. *Hall v. Shipley*, 932 F.2d 1147, 1154 (6th Cir. 1991). In the opinion of the undersigned, defendants are entitled to qualified immunity because plaintiff has failed to show that his constitutional rights were violated.

Accordingly, it is recommended that defendants' motion for summary judgment (Docket #76) be granted and this case be dismissed. It is further recommended that plaintiff's motion to dismiss (Docket #127) be denied.

Further, if the court adopts this recommendation the court should decide that an appeal of this action would not be in good faith within the meaning of 28 U.S.C. § 1915(a)(3). *See*

*McGore v. Wrigglesworth*, 114 F.3d 601, 611 (6th Cir. 1997). For the same reasons that the court grants defendants' motion for summary judgment, the court can discern no good-faith basis for an appeal. It is recommended that should the plaintiff appeal this decision, the court assess the $455 appellate filing fee pursuant to § 1915(b)(1), *see McGore*, 114 F.3d at 610-11, unless plaintiff is barred from proceeding *in forma pauperis*, e.g., by the "three-strikes" rule of § 1915(g). If he is barred, he should be required to pay the $455 appellate filing fee in one lump sum.

NOTICE TO PARTIES: Objections to this Report and Recommendation must be served on opposing parties and filed with the Clerk of the Court within ten (10) days of receipt of this Report and Recommendation. 28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b); W.D. Mich. LCivR 72.3(b). Failure to file timely objections constitutes a waiver of any further right to appeal. *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). *See also Thomas v. Arn*, 474 U.S. 140 (1985).

    /s/ Timothy P. Greeley
TIMOTHY P. GREELEY
UNITED STATES MAGISTRATE JUDGE

Dated: November 21, 2006