UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

_____

LAMONT HEARD,

               Plaintiff,

                                                 Case No. 2:05-cv-231

v.                                       HONORABLE PAUL L. MALONEY

PATRICIA CARUSO, et al.,

               Defendants.

_____/

**OPINION**

          Plaintiff Lamont Heard, an inmate currently confined in the MDOC, filed a *pro se* civil rights action pursuant to 42 U.S.C. § 1983 on September 23, 2005.  In his complaint, Plaintiff named Defendants Patricia L. Caruso, Dennis Straub, Dave J. Burnett, Robert Mulvaney, Jeri-Ann Sherry, Greg McQuiggin, Michael Brown, Steven Therrian, Sandy Shaw, Daniel Ezrow, Unknown Masker, and Unknown Huhta.  On February 6, 2007, the court granted Defendants' motion for summary judgment and dismissed all of Plaintiff's claims, except for his claim against Defendant Masker.  On May 20, 2008, Plaintiff received a trial on his claims against Defendant Masker and, on May 28, 2008, judgment was entered for Defendant Masker.  Plaintiff filed an appeal on June 11, 2008, and on August 27, 2009, the Sixth Circuit vacated the district court's grant of summary judgment for Defendants on Plaintiff's procedural due process, equal protection, and RLUIPA claims, and remanded those claims for further proceedings.  However, the Sixth Circuit affirmed the district court in all other respects.

Plaintiff was appointed counsel on July 7, 2010 (docket #370).  On November 4, 2010, Plaintiff filed an amended complaint (docket #382), which names Defendants Dennis Straub, Dave J. Burnett, Robert Mulvaney, Jeri-Ann Sherry, Michael Brown, and Sandy Shaw.  Plaintiff alleges that in 2004 he was confined in the Chippewa Correctional Facility (URF) and that he is a member of the Nation of Islam (NOI).  While at URF, Plaintiff attended a NOI religious service in which he made certain statements commenting on the history and treatment of African Americans in the United States. Defendant Shaw observed Plaintiff make the statements and reported them to MDOC personnel.  On September 18, 2004, Plaintiff was interviewed by Lieutenant Steven Therrian regarding the statements.  Plaintiff was consequently placed in segregation.  Plaintiff was also charged with a major misconduct for "Incite to Riot or Strike: Rioting or Striking."  A hearing was held on the misconduct ticket on September 23, 2004, and Plaintiff was found guilty of the major misconduct.

Plaintiff alleges that prior to October 5, 2004, he was classified under MDOC security classification guidelines to low to medium security confinement.  On October 5, 2004, as a result of the major misconduct conviction, Plaintiff was identified as a recruiter and was classified as an adherent of "Intolerant / Subversive Groups."  Plaintiff was designated a Security Threat Group (STG) II pursuant to the MDOC security-threat classification system.  Plaintiff was not given a hearing regarding this designation.

Plaintiff's STG II classification automatically resulted in his transfer to a Level V maximum-security facility.  Plaintiff subsequently challenged his major misconduct conviction and STG II classification and requested to be reclassified.  Defendant Brown and Lieutenant Therrian refused to comply with Plaintiff's request.  Plaintiff remained under the STG II classification for approximately 6 years, through August of 2010.  Plaintiff asserts that this designation imposed significant atypical hardships on Plaintiff, including limitations on his eligibility for parole,

2

limitations on visitation, limitations on Plaintiff's interactions with other prisoners, and limitations on Plaintiff's ability to exercise regularly.

Plaintiff asserts that members of the NOI are required to eat in accordance with certain dietary restrictions and that he has repeatedly requested that Defendants Straub, Burnett, Sherry, and Shaw accommodate his request for an NOI diet. Defendants Straub, Burnett, Sherry and Shaw have refused to comply, stating that such a diet cannot meet the MDOC required nutritional standards. Plaintiff contends that this denial has placed a substantial burden on his ability to freely exercise his religious beliefs.

Plaintiff claims that Defendants' actions violated his due process and equal protection rights, as well as his rights under the RLUIPA. Plaintiff is seeking compensatory and punitive damages, as well as declaratory relief and injunctive relief.

Presently before the Court is the Defendants' Motion for Summary Judgment, pursuant to Fed. R. Civ. P. 56 (docket #395). Plaintiff has filed a response (docket #408) and the matter is ready for decision. Summary judgment is appropriate only if the moving party establishes that there is no genuine issue of material fact for trial and that he is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986). If the movant carries the burden of showing there is an absence of evidence to support a claim or defense, then the party opposing the motion must demonstrate by affidavits, depositions, answers to interrogatories, and admissions on file, that there is a genuine issue of material fact for trial. *Id.* at 324-25. The nonmoving party cannot rest on its pleadings but must present "specific facts showing that there is a genuine issue for trial." *Id.* at 324 (quoting Fed. R. Civ. P. 56(e)). The evidence must be viewed in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). Thus, any direct evidence offered by the plaintiff in response to a summary judgment

3

motion must be accepted as true. *Muhammad v. Close*, 379 F.3d 413, 416 (6th Cir. 2004) (*citing Adams v. Metiva*, 31 F.3d 375, 382 (6th Cir. 1994)). However, a mere scintilla of evidence in support of the nonmovant's position will be insufficient. *Anderson*, 477 U.S. at 251-52. Ultimately, the court must determine whether there is sufficient "evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252. *See also Leahy v. Trans Jones, Inc.*, 996 F.2d 136, 139 (6th Cir. 1993) (single affidavit, in presence of other evidence to the contrary, failed to present genuine issue of fact); *cf. Moore, Owen, Thomas & Co. v. Coffey*, 992 F.2d 1439, 1448 (6th Cir. 1993) (single affidavit concerning state of mind created factual issue).

Initially, Defendants assert that they are entitled to summary judgment on Plaintiff's due process claims. "The Fourteenth Amendment protects an individual from deprivation of life, liberty or property, without due process of law." *Bazetta v. McGinnis*, 430 F.3d 795, 801 (6th Cir. 2005). To establish a Fourteenth Amendment procedural due process violation, a plaintiff must show that one of these interests is at stake. *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005). Analysis of a procedural due process claims involves two steps: "[T]he first asks whether there exists a liberty or property interest which has been interfered with by the State; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient." *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989). The Supreme Court long has held that the Due Process Clause does not protect every change in the conditions of confinement having an impact on a prisoner. *See Meachum v. Fano*, 427 U.S. 215, 225 (1976). In *Sandin v. Conner*, 515 U.S. 472, 484 (1995), the Court set forth the standard for determining when a state-created right creates a federally cognizable liberty interest protected by the Due Process Clause. According to the *Sandin* Court, a prisoner is entitled to the protections of due process only when the sanction "will inevitably affect the duration of his sentence" or when a deprivation imposes an "atypical and significant hardship on the inmate

4

in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 486-87; *see also Jones v. Baker*, 155 F.3d 810, 812 (6th Cir. 1998); *Rimmer-Bey v. Brown*, 62 F.3d 789, 790-91 (6th Cir. 1995). The *Sandin* Court concluded that mere placement in administrative segregation did not implicate a liberty interest because the segregation at issue in that case did not impose an atypical and significant hardship. *Sandin*, 515 U.S. at 484; *Wilkinson v. Austin*, 545 U.S. 209, 222-23 (2005).

In its opinion remanding this claim, the Sixth Circuit stated:

> We conclude that there are material issues of fact that prevent summary judgment on Heard's claim that his confinement to a maximum-security facility implicates a protected liberty interest. Unlike the prisoner in *Harbin-Bey v. Rutter*, 420 F.3d 571, 576-77 (6th Cir. 2005), who challenged only his designation by MDOC officials as an STG member, Heard challenges his placement in maximum-security facilities, coupled with the indefinite nature of this placement and the consequences for his eligibility for parole. It appears that there has been no discovery on these issues. On remand, the district court should permit Heard discovery regarding materials relevant to showing the conditions of his confinement in maximum-security facilities, the nature and timing of review of his maximum-security placement, and the consequences of his placement for parole eligibility. Defendants will, of course, have an opportunity to introduce evidence showing that the conditions of confinement in Michigan's maximum-security facilities are distinguishable from those of the maximum-security prison in *Austin*.

> If a prisoner establishes a protected liberty interest, the next question is whether the state afforded the inmate sufficient process. *See Austin*, 545 U.S. at 224. The district court suggested that, even if Heard had a liberty interest, he received sufficient process when he "was called into the Captain's office and his actions were discussed" and when he "received a misconduct hearing and was found guilty" before being designated STG II. R. 143 (Dist. Ct. Op. 2/6/07 at 3). However, on the bare-bones record before us, we cannot say whether Heard received the process that may be due if he has a protected liberty interest. Therefore, if the district court finds on remand that Heard's placement in maximum-security facilities implicates a protected liberty interest, it should then consider whether prison officials have given Heard the process to which he is due under the framework set forth by the Supreme Court in *Austin* and, if so, whether Heard actually received these procedural protections. *See Austin*, 545 U.S. at 224-30

(applying the three factors set forth in *Mathews v. Eldridge*, 424 U.S. 319 (1976)).

*Heard v. Caruso, et al.*, Nos. 08-1710/1779/1820, pp. 11-12 (6th Cir. Aug. 27, 2009) (docket #273).

In their motion for summary judgment, Defendants assert that they are entitled to qualified immunity from civil damages with regard to Plaintiff's due process claims because they did not violate a clearly established constitutional right of which a reasonable person would have known. "Under the doctrine of qualified immunity, 'government officials performing discretionary functions generally are shielded from liability from civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Phillips v. Roane County*, 534 F.3d 531, 538 (6th Cir.2008) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Determining whether the government officials in this case are entitled to qualified immunity generally requires two inquiries: "First, viewing the facts in the light most favorable to the plaintiff, has the plaintiff shown that a constitutional violation has occurred? Second, was the right clearly established at the time of the violation?" *Id.* at 538-39 (citing *Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir.2006)); *cf. Pearson v. Callahan*, 555 U.S. 223 (2009) (holding that the two-part test is not longer considered mandatory; thereby freeing district courts from rigidly, and potentially wastefully, applying the two-part test in cases that could more efficiently be resolved by a modified application of that framework).

In support of their motion for summary judgment, Defendants offer a copy of the hearing report for the incite to riot charge which was held on September 23, 2004. Hearing Officer Durant found Plaintiff guilty of the charge. The court notes that the hearing officer's conclusion that Plaintiff was guilty of the misconduct charge was supported by the record. In the reasons for finding, the Hearing Officer stated:

I find no other prisoners witnesses are necessary since they would be repetitious in nature. Prisoner Heard's questions for the hearing investigator and request for a bible are not relevant and would not prove or disprove the charges. Prisoner Heard argues that speech is a protected first amendment [sic] right however this is with out [sic] merit as the speech he is advocating is in a prison setting, is not protected speech because he is advocating more than mere speech but conduct by instigating actions which are intended to seriously endanger the physical safety of the facility, persons or property. On 9-18-04 at 1430 hrs prisoner Heard was addressing prisoners during a Nation of Islam service and stated the following, calling for the oppressed people to rise up against the oppressors. Prisoner Heard referred to treatment by the guards and stated, "A resurrected man won't put up with the treatment. An FOI (Fruit of Islam) will strike back if mistreated. He also stated, How do you establish peace? Through war! They (prison staff) don't want peace. They want to paint you in their image. We have a real problem here. The white system is the enemy! If they react to this message today - some of us be put in prison - we already in prison! He also made reference to the film Passion, recently shown as one of the prison movies and stated, when they beat Jesus and the pain and the blood black people beat like that every day because of who we are - by the crackers, the guards. When prisoner Heard was interviewed at 1650 hrs he stated to [Lieutenant] Therrian, The officers at URF do not respect the black man, but they will. He further added that Jesus was persecuted, crucified and ramifications, so shall I be persecuted and so shall there be ramifications. I find that these statements by prisoner Heard were advocating and instigating actions by other prisoners which are intended to seriously endanger the physical safety of the facility, person and property by disruption of the facility by a group. Prisoner Heard did not deny making the statements as cited by Chaplain Shaw but stated they were taken out of context however the other inmates were agreeing by nodding their heads ad [sic] stated that's right. Prisoner Heard is not believed in his statement that he was only talking about the history of black people in America and was not out to hurt anyone because Chaplain Shaw heard him make the above statements as listed above and gives no reason or basis for the Chaplain to take them out of context. [Lieutenant] Therrian and Chaplain Shaw are clear and factual in their statements and found credible. The charge is upheld.

(Defendants' Exhibit 4.)

7

It is clear that Plaintiff received due process of law with regard to the underlying misconduct conviction, and that he cannot support any claim that his constitutional rights were violated during the misconduct hearing. Prison inmates subject to serious disciplinary action are entitled to (1) 24 hours advance written notice of the charges; (2) an opportunity to appear at a hearing, to call witnesses, and present rebuttal evidence when permitting the inmate to do so will not be unduly hazardous to institutional safety; and (3) a written statement by the factfinders as to the evidence relied upon for their decision which includes a statement as to the reasons for the decision. *Wolff v. McDonnell*, 418 U.S. 539, 564-66 (1974). If the prisoner received these procedural protections, and if there were "some facts" to support the decision of the hearings officer, then the prisoner received all the process to which he was due. *Superintendent of Massachusetts Institute, Walpole v. Hill*, 472 U.S. 445 (1985). Plaintiff has failed to show that his constitutional rights were denied with regard to the underlying misconduct conviction. Therefore, the question is whether his subsequent classification as an STG II prisoner and transfer to a maximum security prison violated his due process rights.

In their brief, Defendants note that Plaintiff failed to have his misconduct conviction overturned and that as a result of that conviction, Defendant Brown recommended that Plaintiff be designated as a Security Threat Group (STG) Member of an Intolerant / Subversive Group. (Defendants' Exhibit 5.) Defendant Mulvaney agreed and Plaintiff was designated as an STG II pursuant to MDOC Policy Directive 04.04.113.

According to the policy directive, an STG II member must be housed in a level V security unit unless the prisoner is classified to administrative segregation, housed in security level VI, or the CFA Classification Director determines that such placement is not necessary. As a result of the STG II designation, a prisoner shall be limited to two non-contact visits per month, excluding

8

visits with an attorney, clergy, and staff of the Office of the Legislative Corrections Ombudsman. In addition, any classification to a work or school assignment must be approved by the CFA Deputy Director. STG II members may attend yard, religious services of their designated religion, library, group counseling or therapy, but may not attend other group activities. In addition, participation in scheduled leisure time activities during yard is prohibited. A STG II prisoner's cell shall be searched at least twice a week and out of cell movement shall not exceed one hour per day, excluding showers, meals, work and school assignments, religious services, law library, group counseling or therapy, and visits with an attorney, clergy, or staff of the Office of the Legislative Corrections Ombudsman. (Defendants' Exhibit 6.)

On October 19, 2004, Plaintiff requested removal of the STG II designation. (Defendants' Exhibit 8.) On October 21, 2004, Defendant Brown refused Plaintiff's request, stating that Plaintiff was labeled a recruiter based on his statements, which were a call to others to rise up and join his cause. Defendant Brown noted that Plaintiff was given a hearing regarding the statements and was found guilty of "Incite to Riot or Strike; Rioting or Striking." Defendant Brown asserted that Plaintiff's statements and the fact that the hearing officer found Plaintiff guilty of making the statements were the reason that Plaintiff had been labeled a recruiter. Defendant Brown concluded that Plaintiff's actions would be monitored over a period of time to determine whether Plaintiff had disassociated himself from STG activities, and advised Plaintiff to request the removal of his STG designation at a later date. (Defendants' Exhibit 9.) On October 22, 2004, Plaintiff was transferred to the Baraga Correctional Facility (AMF) a Level V security prison.

Defendants state that there is a distinction between the STG process and the disciplinary process, and that while interrelated, the two processes are separate. Defendants explain that Plaintiff's STG II status resulted in his placement in a Level V security prison. However,

Plaintiff's conviction for Incite to Riot caused him to be placed in administrative segregation at Level V. Plaintiff stayed in administrative segregation at AMF from October 22, 2004, until May 20, 2005, a period of approximately seven months. Defendants assert that from May 20, 2005, until August 4, 2010, Plaintiff was housed in the general population at Level V, although as an STG II prisoner, Plaintiff faced restrictions above and beyond those imposed on other prisoners in Level V. Plaintiff renounced his affiliation with Intolerant / Subversive Groups on April 7, 2010. (Defendants' Exhibit 10.) On August 4, 2010, Plaintiff was transferred to the Chippewa Correctional Facility (URF) a Level IV facility. On August 17, 2010, Plaintiff was transferred to the Saginaw Regional Correctional Facility (SRF) as a Level IV prisoner. On December 2, 2010, Plaintiff was moved to Level II at SRF, and Plaintiff is currently housed at the Lakeland Correctional Facility as a Level II prisoner.

For the purpose of this motion, Defendants concede that the seven months that Plaintiff spent in administrative segregation at AMF constituted an atypical and significant hardship. Defendants note that conditions in Ohio's maximum-security institutions appear to be similar to Michigan's Level V administrative segregation. However, Defendants contend that Plaintiff was provided with a sufficient level of due process to protect his constitutional rights. Defendants note that during Plaintiff's time in administrative segregation, MDOC Policy Directive 04.05.120 governed his placement and continued confinement in administrative segregation. (Defendants' Exhibits 14 and 15.) Defendants state that Ohio's policy regarding prisoner placement and continued confinement in maximum security prisons is virtually identical to the policy in Michigan. Defendants note that pursuant to Policy Directive 04.05.120, ¶ J, a prisoner must be given a hearing before a neutral fact finder and allowed to present evidence before being placed in administrative segregation. (Defendants' Exhibits 14 and 15.) Ohio has a similar process. *See Wilkinson v. Austin*, 545 U.S. at

226.   Policy Directive 04.05.120, ¶ Q and ¶ WW[1] provide that Michigan prisoners, like Ohio prisoners, may appeal the fact finder's decision, as well as seek continual review of their placement in administrative segregation (defendants' Exhibits 14 and 15.).   *See Wilkinson v. Austin*, 545 U.S. at 226-27.

Defendants also state that Plaintiff's claim that his placement in administrative segregation prohibited his release on parole lacks merit because Plaintiff is serving two non-parolable life sentences.  (*See* MDOC Offender Tracking System, http://mdocweb.state.mi.us/otis2/otis2profile.aspx?mdocNumber=252329.)   Therefore, he is not eligible for parole.  Defendants further note that there is no "per se" rule that prohibits a prisoner in administrative segregation from being paroled. Defendants conclude that because Michigan's policy with regard to placement and confinement of inmates in administrative segregation is virtually identical to Ohio's policy, which was held to be constitutional in *Wilkinson v. Austin*, they are entitled to qualified immunity on this claim.  The court agrees.  Assuming that Plaintiff's placement in administrative segregation at Level V constituted an atypical and significant hardship, Plaintiff was afforded a sufficient level of due process in light of *Wilkinson v. Austin* to protect his constitutional rights.

Defendants further state that the time that Plaintiff spent in general population at Level V did not constitute an atypical and significant hardship.  As noted above, while Plaintiff was housed in the general population as an STG II prisoner, he was limited to two non-contact visits per month, excluding visits with an attorney, clergy, and staff of the Office of the Legislative Corrections

---

[1]PD 04.05.120 ¶ Q states that the Hearing Officer's decision may be appealed by either the prisoner or the warden by submitting a request for rehearing to the Hearings and Appeals Division of the Office of Policy and Hearings, except in the case of decisions by the SCC, which must be appealed through the grievance process.  PD 04.05.120 ¶ WW provides that the behavioral adjustment of administrative segregation prisoners shall be regularly reviewed by the SCC or housing unit team.  Reviews shall include a personal interview with each prisoner and shall occur at intervals of no more than seven calendar days thereafter.  Each review shall be documented on the administrative segregation behavior review form.

Ombudsman.  In addition, any classification to a work or school assignment had to be approved by the CFA Deputy Director.  He was not allowed to attend group activities other than yard, religious services provided by his designated religion, library, group counseling or therapy.  Plaintiff was also prohibited from participation in scheduled leisure time activities during yard.  Plaintiff's cell was searched at least twice a week and his out of cell movement could not exceed one hour per day, excluding showers, meals, work and school assignments, religious services, law library, group counseling or therapy, and visits with an attorney, clergy, or staff of the Office of the Legislative Corrections Ombudsman.  (Defendants' Exhibit 6.)

Defendants note that pursuant to *Bazzetta v. McGinnis*, 430 F.3d 795, 804-05 (6th Cir. 2005), prisoners do not have a right to visitation.  Nor do prisoners have a right to employment, rehabilitation, education, or other programming.  *See Rhodes v. Chapman*, 452 U.S. 337, 348 (1981); *Moody v. Daggett*, 429 U.S. 78, 88, n.9 (1976); *Newsom v. Norris*, 888 F.2d 371, 374-75 (6th Cir. 1989); *Canterino v. Wilson*, 869 F.2d 948, 952-54 (6th Cir. 1989); *Ivey v. Wilson*, 832 F.2d 950, 955 (6th Cir. 1987); *Bills v. Henderson*, 631 F.2d 1287 (6th Cir. 1980).  In addition, the court notes that prisoners do not have a reasonable expectation of privacy in their cells, and have no constitutional right to be free from having their cells searched twice a week.  *Hudson v. Palmer*, 468 U.S. 517, 522-526, 528 n 8 (1984).  Defendants state that the above supports a conclusion that the restrictions imposed on Plaintiff while confined to the general population as a Level V STG II prisoner do not constitute an atypical and significant hardship.

Defendants state that even if Plaintiff's STG II classification imposed conditions which rise to the level of an atypical and significant hardship, they are still entitled to summary judgment on this issue because Plaintiff was provided with all the process he was due.  Defendants offer Policy Directive 04.04.113, ¶ CC, which provides that local STG Coordinators must review STG II prisoners

status once every six months.  The STG Coordinator's decision is reviewed by the Warden, the STG Coordinator in Lansing, and the Deputy Director of the MDOC.  Defendants contend that, at a minimum, because the STG policy has never been ruled unconstitutional, they are entitled to qualified immunity.

In response to Defendants' assertions, Plaintiff claims that his initial designation as a STG II member constituted a violation of his rights under the Due Process Clause of the Fourteenth Amendment.  However, as noted above, this designation was the direct result of Plaintiff's misconduct conviction for "Incite to Riot."  Plaintiff received a hearing on this misconduct, and was found guilty by the Hearing Officer.  Plaintiff did not have his conviction overturned.  Plaintiff states that while confined in administrative segregation at Level V, he was subjected to numerous conditions which combined to render his confinement atypical and significant.  As noted above, Defendants concede that Plaintiff's confinement in administrative segregation while at Level V was atypical and significant.  However, because Plaintiff received sufficient due process protections, his confinement in administrative segregation did not violate his due process rights.

Plaintiff also appears to be claiming that his confinement in the general population at Level V as an STG II prisoner subjected him to conditions which were atypical and significant.  As noted by the Sixth Circuit in their opinion, the pertinent question is whether conditions of confinement in Michigan's maximum-security facilities are distinguishable from those of the maximum-security prison in *Wilkinson v. Austin*.  In *Wilkinson v. Austin*, conditions in the Ohio State Penitentiary (OSP), a "supermax" facility, were such that almost all human contact was prohibited, even to the point that conversation was not permitted from cell to cell.  The plaintiff's cell lights might be dimmed, but remained on 24 hours a day.  In addition, the plaintiff in *Wilkinson v. Austin* was only able to exercise for one hour each day in a small indoor room.  The court in *Wilkinson v.*

13

*Austin* noted that not only were the restrictions in the OSP quite severe, placement in the OSP was indefinite.  Finally, the *Wilkinson v. Austin* court observed that placement in the OSP disqualifies an otherwise eligible prisoner for parole consideration.  *See Wilkinson v. Austin*, 545 U.S. at 214-15.

In contrast to the conditions at issue in *Wilkinson v. Austin*, Plaintiff in this case was allowed two non-contact visits per month, in addition to visits with an attorney, clergy, and staff of the Office of the Legislative Corrections Ombudsman.  Plaintiff was also allowed to attend religious services provided by his designated religion, go to the library, and attend group counseling or therapy if pertinent.  And although Plaintiff's out of cell movement could not exceed one hour per day, this time did not include times spent outside of his cell for showers, meals, religious services, law library, group counseling or therapy, and visits with an attorney, clergy, or staff of the Office of the Legislative Corrections Ombudsman.  (Defendants' Exhibit 6; *see also* Plaintiff's Exhibit 4 (Deputy Director Straub's deposition testimony).)  Moreover, as noted by Defendants, Plaintiff is serving two non-parolable life sentences and is not eligible for parole.   In his deposition testimony, Deputy Director Straub states that being a STG II member does not render a prisoner ineligible for parole review.  (Plaintiff's Exhibit 4, p. 7.)  Defendants further note that there is no "per se" rule that prohibits a level V prisoner from being paroled.  For the reasons set forth above, the court concludes that Plaintiff's living conditions during his time in the general population at Level V did not constitute an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484 (1995).  Therefore, Plaintiff did not have a liberty interest in the procedures affecting his classification and security.  *Id.*

Moreover, the court notes that Policy Directive 04.04.113, ¶ CC provides that local STG Coordinators must review STG II prisoners status once every six months.  The STG Coordinator's decision is reviewed by the Warden, the STG Coordinator in Lansing, and the Deputy

14

Director of the MDOC. In addition, if the local STG Coordinator determines that the prisoner has discontinued STG associations and activities, the prisoner shall be offered the opportunity to formally renounce membership by completing the Security Threat Group Renunciation / Removal form. If the prisoner completes the form, the local STG Coordinator shall recommend to the Warden that the designation be removed. If the Warden agrees, the recommendation shall be forwarded to the CFA Deputy Director, who shall make the final determination. (Defendants' Exhibit 7.) In the instant action, Plaintiff renounced his affiliation with Intolerant / Subversive groups on April 7, 2010, and was subsequently transferred to SRF as a level IV prisoner on August 17, 2010. (Defendants' Exhibit 10.) Therefore, Plaintiff was able to have the STG II label removed and be reclassified to a lower security level by renouncing his affiliation. The court concludes that the record supports a finding that Plaintiff received sufficient process to protect his constitutional rights. *Incumaa v. Ozmint,* 507 F.3d 281, 289 (4th Cir.2007) (noting that an inmate's assignment to a maximum security unit is directly tied to an inmate's bad behavior so the inmate " 'holds the keys' to his remaining free from the unit."); *Williams v. Greifinger,* 97 F.3d 699, 705 (2nd Cir.1996) (a prisoner "holds the keys to his cell" when he remains in solitary confinement until he abides by prison rules). Plaintiff's assertion that his removal from STG status is contingent upon remaining free of future misconducts for disrupting prison security does not implicate the sufficiency of the process he already received. Rather, such a policy merely shows that Plaintiff can control the level of his confinement by avoiding certain prohibited conduct. Moreover, it is not unreasonable for prison officials to motivate a prisoner's desire to comply with prison rules by threatening to punish a prisoner for misbehaving.

For the reasons set forth above, the court concludes that Plaintiff's initial confinement in administrative segregation and his subsequent confinement as an STG II prisoner in the general population at level V did "not violate clearly established statutory or constitutional rights of which

15

a reasonable person would have known.'" *Phillips*, 534 F.3d at 538 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  As noted previously, viewing the facts in the light most favorable to Plaintiff, his initial confinement in administrative segregation and his subsequent confinement as an STG II prisoner in the general population at level V did not violate the constitution.  Moreover, Plaintiff did not have a clearly established right to be free from such confinement at the time of the violation.  *Id.* at 538-39 (citing *Silberstein*, 440 F.3d at 311; *cf. Pearson v. Callahan*, 555 U.S. 223 (2009)).

Defendants also state that they are entitled to qualified immunity on Plaintiff's claim that he was denied a Nation of Islam (NOI) diet.  With regard to Plaintiff's equal protection claim regarding his diet, the Sixth Circuit stated:

> "[When a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Turner v. Safely*, 482 U.S. 78, 89 (1987).  We have explained that in the prison context "policies infringing on religious rights may be found unreasonable where accommodations are made for others." *Turner v. Bolden*, 8 F. App'x 453, 456 (6th Cir. 2001) (unpublished order). If the defendants can show that the Nation-of-Islam diet requested by Heard fails to meet nutritional standards, we believe that the refusal to provide this diet would be "reasonably related to legitimate penological interests." *Turner*, 482 U.S. at 89. The defendants have come forward with some evidence that the Nation-of-Islam diet is nutritionally inadequate—the affidavit of defendant Burnett, who evidently consulted the MDOC documents in which it was determined that the Nation-of-Islam diet was inadequate. However, it appears that Heard has been denied discovery of the MDOC documents and, therefore, denied the opportunity to dispute defendants' evidence.

*Heard v. Caruso, et al.*, Nos. 08-1710/1779/1820, pp. 16-17 (6th Cir. Aug. 27, 2009) (docket #273).

Defendants assert that the decision to refuse Plaintiff's request for a NOI diet satisfies that rational basis test set forth in *Turner v. Safely*, so that they are entitled to summary judgment on

this claim.  To determine whether a prison official's actions are reasonably related to a legitimate

penological interest, the Court must assess the official's actions by reference to the following factors:

> 1.  does there exist a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it;
>
> 2.  are there alternative means of exercising the right that remain open to prison inmates;
>
> 3.  the impact that accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally; and
>
> 4.  whether there are ready alternatives available that fully accommodate the prisoner's rights at de minimis cost to valid penological interests.

*Flagner*, 241 F.3d at 484 (quoting *Turner*, 482 U.S. at 89-91).

Failure to satisfy the first factor renders the regulation or action infirm, without regard

to the remaining three factors.  *Flagner*, 241 F.3d at 484 (quoting *Turner*, 482 U.S. at 89-90) ("a

regulation cannot be sustained where the logical connection between the regulation and the asserted

goal is so remote as to render the policy arbitrary or irrational").  If the first factor is satisfied, the

remaining three factors are considered and balanced together; however, they are "not necessarily

weighed evenly," but instead represent "guidelines" by which the court can assess whether the policy

or action at issue is reasonably related to a legitimate penological interest.  *Flagner*, 241 F.3d at 484

(citations omitted).  It should further be noted that the *Turner* standard is not a "least restrictive

alternative" test requiring prison officials "to set up and then shoot down every conceivable

alternative method of accommodating the claimant's constitutional complaint."  Instead, the issue is

simply whether the policy or action at issue is reasonably related to a legitimate penological interest.

*Id.*

Defendants offer the April 8, 2011, deposition testimony of Gatha McClellan, who retired from her position as Food Service Director for Correctional Facilities Administration for the MDOC on July 31, 2009. (Defendants' Exhibit 16.) Ms. McClellan testified that she had purchased and read two books in order to research what would be required in providing a diet in compliance with Elijah Muhammad's *How to Eat to Live*. McClellan stated that the diet was very restrictive, prohibited numerous types of foods, and only provided for one meal every two days. (Defendants' Exhibit 16, p. 13.) Defendants attach a list of 35 different kinds of foods which are prohibited by the NOI diet, including peanut butter and potatoes. (Defendants' Exhibit 16, attachment 1.) McClellan testified that peanut butter is one of the many sources of protein for prisoners in the MDOC and that potatoes are another staple of food in the MDOC. McClellan also noted that the only type of bean allowed by the NOI diet was navy beans, which were one of the more expensive type of beans. (Defendants' Exhibit 16, pp. 19-22.) McClellan opined that the NOI diet would be unworkable and that implementing the diet could pose a threat to security because it would require the MDOC to house large numbers of NOI prisoners at a few institutions in order to accommodate their dietary needs. (Defendants' Exhibit 16, pp. 25-26.)

The court notes that the reasons set forth by Defendants mainly address the potential expense and inconvenience to the MDOC of instituting such a diet. However, as noted by Plaintiff, such considerations apply to implementing any religious diet, including Buddhist and Kosher diets, both of which are provided by the MDOC. With regard to the issue of whether the NOI diet is nutritionally adequate, Defendants fail to expand on their previous assertion, and merely refer to Attachment A of Policy Directive 04.07.100, which states that male prisoners in the MDOC are to be provided with a diet constituting 2,900 kcal per day. (Defendants' Exhibit 16, attachment 1.) In response, Plaintiff offers an excerpt from *How to Eat to Live*, which states that eating one meal a day,

18

of the right kind of food and having a pure drink, will bring health and prolonged life, and that eating

once every other day would be even better.  However, there does not appear to be any requirement

that adherents eat only every other day.  Rather, the proscription appears to be regarding the types of

foods allowed, similar to Buddhist and Kosher diets.  (Plaintiff's Exhibit 19.)  Because there

continues to be an issue of fact regarding whether Defendants' refusal to provide Plaintiff with an

NOI diet violates his equal protection rights, Defendants' request for summary judgment on this issue

is properly denied.

Finally, Defendants state that they are entitled to qualified immunity on Plaintiff's

RLUIPA claim.  The RLUIPA statute provides, in pertinent part, that

> [n]o government shall impose a substantial burden on the religious exercise of a
> person residing in or confined to an institution ... even if the burden results from a rule
> of general applicability, unless the government demonstrates that imposition of the
> burden on that person-
>
> (1) is in furtherance of a compelling governmental interest; and
>
> (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1(a).

Although the statute permits the recovery of "appropriate relief against a government,"

42 U.S.C. § 2000cc-2(a), the Sixth Circuit recently held that monetary damages are not available

under RLUIPA. *Cardinal v. Metrish*, 564 F.3d 794, 801 (6th Cir. 2009) ("[T]he Eleventh Amendment

bars plaintiff's claim for monetary relief under RLUIPA."), petition for cert. filed, 78 U.S.L.W. 3065

(U.S. July 22, 2009) (No. 09-109).  In *Sossamon v. Texas*, ___ S. Ct. ___, 2011 WL 1485252 (Apr.

20, 2011), the Supreme Court also held that the RLUIPA did not abrogate sovereign immunity under

the Eleventh Amendment.

19

In relevant part, the RLUIPA prohibits any government from imposing a "substantial burden on the religious exercise" of a prisoner, unless such burden constitutes the least restrictive means of furthering a compelling governmental interest.  42 U.S.C. § 2000cc-1(a).  The term "religious exercise" "includes any exercise of religion, whether or not compelled by, or central to, a system of religious belief."  42 U.S.C. § 2000cc-5(7).  While this definition of religious exercise is broad, it does require that Plaintiff's religious beliefs be "sincerely held."  *See, e.g., Episcopal Student Foundation v. City of Ann Arbor*, 341 F.Supp.2d 691, 700 (E.D. Mich. 2004) (citation omitted); *Lovelace v. Lee*, 472 F.3d 174, 187 n.2 (4th Cir. 2006) (citations omitted).  However, prison officials may not inquire into whether a particular belief or practice is "central" to a prisoner's religion.  *Cutter v. Wilkinson*, 544 U.S. 709, 725 n.13 (2005) (recognizing that "the truth of a belief is not open to question, rather the question is whether the objector's beliefs are truly held").

While the phrase "substantial burden" is not defined in the RLUIPA, courts have concluded that a burden is substantial where it forces an individual to choose between the tenets of his religion and foregoing governmental benefits or places "substantial pressure on an adherent to modify his behavior and to violate his beliefs."  *Living Water Church of God v. Charter Township of Meridian*, 258 Fed. Appx. 729, 733-34 (6th Cir., Dec. 10, 2007) (citations omitted); *see also*, *Marshall v. Frank*, 2007 WL 1556872 at *5 (W.D. Wis., May 24, 2007) (quoting *Civil Liberties for Urban Believers v. City of Chicago*, 342 F.3d 752, 761 (7th Cir. 2003)) (a substantial burden is one which renders religious exercise "effectively impracticable"); *Cutter v. Wilkinson*, 544 U.S. 709, 720 (2005) (recognizing that RLUIPA's institutionalized persons provision was intended to alleviate only "exceptional" burdens on religious exercise).

By the same token, a burden is less than "substantial" where it imposes merely an "inconvenience on religious exercise," *see, e.g., Konikov v. Orange County, Florida*, 410 F.3d 1317,

1323 (11th Cir. 2005), or does not "pressure the individual to violate his or her religious beliefs." *Living Water Church of God v. Charter Township of Meridian*, 258 Fed. Appx. at 734. Such conclusions recognize that RLUIPA was not intended to create a cause of action in response to every decision which serves to inhibit or constrain religious exercise, as such would render meaningless the word "substantial." *See Civil Liberties for Urban Believers*, 342 F.3d at 761.

> In its opinion, the Sixth Circuit stated:
>
>> If Heard's religion requires adherence to a Nation-of-Islam diet, prison officials' refusal to accommodate this diet would impose a substantial burden. *See, e.g.*, *Al-Amin v. Shear*, No. 08-7681, 2009 WL 971454, at *2-3 (4th Cir. Apr. 10, 2009) (unpublished) (finding that denying kosher ("Common Fare") food to observant Sunni Muslim during Ramadan would be a substantial burden). The defendants would then have the burden of showing that denial of the Nation-of-Islam diet was the least restrictive means of furthering a compelling government interest. As explained above with respect to Heard's equal-protection claim, there remains a material issue of fact as to whether Heard's proposed Nation-of-Islam diet does or does not meet MDOC nutritional standards.

*Heard v. Caruso, et al.*, Nos. 08-1710/1779/1820, pp. 18-19 (6th Cir. Aug. 27, 2009) (docket #273).

> In addition, in a footnote, the Sixth Circuit stated that pursuant to *Cardinal v. Metrish*, 564 F.3d 794 (6th Cir. 2009), Plaintiff Heard may seek only declaratory or injunctive relief and not monetary relief with respect to his RLUIPA claim against defendants in their *official* capacities. The Sixth Circuit then cited *Nelson v. Miller*, 570 F.3d 868, 885-89 (7th Cir. 2009) (discussing split of authority on issue; holding that RLUIPA does not subject state officials to suit in their individual capacities) and noted that it has not ruled on whether RLUIPA authorizes suits for monetary damages against state officials in their *individual* capacities. The Court declined to address the issue because it was remanding to the district court for further consideration of whether a Nation-of-Islam diet

meets MDOC nutritional standards and because the parties have not briefed this issue.  *Heard v. Caruso, et al.*, Nos. 08-1710/1779/1820, p. 19, n. 5 (6th Cir. Aug. 27, 2009) (docket #273).

In their brief, Defendants contend that Plaintiff has not demonstrated that his religion compels him to follow the NOI diet.  Defendants offer the deposition testimony of Dave Burnett, in which he testifies that most of the members of the NOI do not adhere to the diet set forth by Elijah Muhammad.  (Defendants' Exhibit 17, p. 19.)  However, in Plaintiff's affidavit, he attests that in addition to being a member of the NOI, he is a follower of the teachings of Elijah Muhammad and that, as such, he is compelled to follow his dietary teachings.  (Plaintiff's Exhibit 1, ¶¶ 6-7.) Therefore, there appears to be an issue of fact regarding whether Defendants' refusal to provide Plaintiff with the NOI diet substantially burdens the practice of Plaintiff's religious beliefs.

Defendants further state that they have a compelling state interest in not providing an NOI diet, because such a provision would divert funds from other areas of the MDOC budget, such as employee salaries, and ultimately impact prison security.  Defendants refer to Michigan's current budget crisis and Gatha McClellan's deposition testimony, which asserts that providing an NOI diet would significantly increase costs.  However, Defendants' assertions lack specificity regarding the amount and nature of such increased costs.  Moreover, Defendants claim that prison security would be affected are vague and conclusory.  On one hand, Defendants state that requiring all prisoners to eat navy beans with every meal would cause resentment (despite the fact that there is no indication that an NOI diet would require that navy beans be served with every meal).  On the other hand, Defendants claim that providing such a diet would require large numbers of NOI prisoners to be housed at a small number of facilities.  However, if all NOI prisoners were housed together, there would be no need to require non-NOI prisoners to eat navy beans.  The court concludes that there is a genuine issue of material fact regarding whether Defendants have a compelling state interest in

refusing Plaintiff's request for an NOI diet.  Consequently, Defendants are not entitled to summary judgment on this claim.

In light of the foregoing, the court concludes that Plaintiff has failed to sustain his burden of proof in response to Defendants' request for summary judgment on his due process claims regarding his security classification and placement in a level V facility.  However, as noted above, there appears to be genuine issues of material fact regarding Plaintiff's equal protection and RLUIPA claims.  Therefore, the court will deny summary judgment on those claims.

An Order consistent with this Opinion will be entered.


Dated: August 30, 2011                       /s/   Paul L. Maloney
                                             Paul L. Maloney
                                             Chief United States District Judge

23